UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
at CHATTANOOGA

| UNITED STATES OF AMERICA | ) | |
| --- | --- | --- |
| | ) | No. 1:10-cr-20 |
| v. | ) | |
| | ) | *Mattice / Lee* |
| DION AULT, a/k/a DON AULT | ) | |

## REPORT AND RECOMMENDATION

Before the Court is the motion of Defendant Dion Ault ("Defendant") to suppress evidence, including a shotgun and rifle seized from his property, and statements made by him, on June 12, 2008 [Doc. 10].[1] Specifically, Defendant contends the seizing officers improperly induced his consent to a search of his garage by pretending they wanted to see a unique automobile he owned. After considering the testimony and the parties' briefs [Doc. 11 & 18], I find no constitutional violation, and I **RECOMMEND** Defendant's motion to suppress be **DENIED**.

**I.     BACKGROUND**

At the hearing, the Government offered the testimony of Drug Enforcement Agency ("DEA") Special Agent David Shelton ("Shelton") the only witness to testify. Shelton's testimony was not impeached or discredited, and I **FIND** it wholly credible.

Shelton testified as follows: On June 12, 2008, in the middle of the afternoon, he accompanied DEA Task Force Officer Jeffrey Sills ("Sills") to Defendant's residence in Bledsoe County, Tennessee. Neither Shelton nor Sills were uniformed or carrying visible firearms, and they were driving an unmarked car. The agents intended to interview Defendant about an associate of

---

[1] The motion was referred for a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and (C) [Doc. 12], and an evidentiary hearing was held on May 10, 2010. The matter is now ripe for decision.

his who was allegedly involved in marijuana trafficking in Bledsoe County, and to inquire about an incident two months prior in which Defendant reportedly shot his own nephew with a .22 caliber gun. Shelton and Sills, who did not have a warrant, were greeted at the front door of Defendant's residence by Defendant's daughter, who advised them that Defendant was running an errand and would be back shortly. Neither Shelton nor Sills entered the house; instead, they waited in Defendant's driveway, admiring a 1992 Cadillac Allante convertible.

About ten minutes later, Defendant arrived and stopped where the agents were standing in the driveway, some distance away from the house. Defendant engaged the agents in conversation, and both Shelton and Sills identified themselves as law enforcement officers. The agents informed Defendant of the purposes of their visit, but the majority of the next five to ten minutes was spent talking about cars. At some point, the conversation turned to the other classic cars owned by Defendant, including a classic Camaro Roadster convertible. As an fellow owner of a classic Camaro, Shelton expressed interest in Defendant's Camaro, and Defendant invited Shelton and Sills in to his basement garage. Shelton and Sills accepted the invitation.

The three men entered the garage from an exterior door, the agents following Defendant. Inside were several cars, including the Camaro, which was parked in the opposite corner from the door. As the men approached the Camaro, Shelton noticed a pistol grip pump shotgun laying on a towel on the trunk of the car. Shelton was surprised to see the gun because he knew from previous conversations with Sills that Defendant was a convicted felon. Defendant quickly flipped the towel over the gun and placed it on a workbench, stating that it was his wife's gun. At that point, Shelton observed an M1, .30 caliber, carbine rifle on the workbench in the same general area. Shelton informed Defendant that as a convicted felon, he was not allowed to have firearms, and Defendant

responded that "a man's got to protect himself." Defendant explained that the shotgun had previously been stolen from him in a burglary, but he chased the thieves with a handgun, firing shots into the air. Ultimately, he was able to get the shotgun back from the Sheriff's office. While telling that story, Defendant referred to the shotgun as "my" shotgun.

Shelton also observed a hard case designed for a rifle and several fold-over zippered cases for long guns, but he did not inquire whether there were any guns in them. Defendant volunteered, however, that there were other guns in the house. Shelton seized the shotgun, which was loaded with five shells, and the rifle.

## II. ANALYSIS

Defendant seeks to suppress the shotgun and rifle, as well as all statements he made admitting possession of same, arguing that his consent to the officers' entry was fraudulently induced.[2] Because the officers entered Defendant's garage without a warrant, the Government bears the burden to show Defendant's consent was valid. *United States v. Moon*, 513 F.3d 527, 537 (6th Cir. 2008). Consent is valid only if it is voluntary--i.e., "unequivocal, specific and intelligently given, [and] uncontaminated by any duress or coercion." *Id.* The Government must carry its burden with "clear and positive testimony." In other words, the government must show affirmative consent; it is not enough to show that a defendant "mere[ly] acquiesce[d]" to a search because he believed resistance to be futile. *Id.*; *United States v. Worley*, 193 F.3d 380, 386 (6th Cir. 1999). Defendant does not argue that his consent was not "unequivocal" or "specific." Nor does he contend it was not "intelligent;" indeed, "intelligence" in this context means only that the suspect knew what he was

---

[2] Defendant has not argued any basis for suppressing the evidence or statements if the entry was proper.

doing, not that he knew he was giving up a constitutional right. *See Schneckloth v. Bustamonte*, 412 U.S. 218 (1973). The issue here, therefore, is whether Defendant's consent was contaminated by coercion.

A suspect may be coerced into consenting to a search by an officer's force or threat of force, or by "more subtle or implicit" tactics. *Worley*, 193 F.3d at 386 n.10. *See also United States v. Carter*, 378 F.3d 584, 588 (6th Cir. 2004) (recognizing that consent may be tainted by "trickery"). There is no "magic formula or equation" for determining when trickery goes too far in the abstract; instead, the inquiry must account for all the circumstances, including the possibly vulnerable subjective state of the suspect. *Schneckloth*, 412 U.S. at 229, 234 n.15 (1973); *Lewis v. United States*, 385 U.S. 206, 208 (1966) ("[T]he particular circumstances of each case govern the admissibility of evidence obtained by strategem or deception."). The officer's intentions are not controlling: what matters is the "*effect* of the ruse" on the suspect. *United States v. Hardin*, 539 F.3d 404, 425 (6th Cir. 2008) (emphasis added). *See also United States v. Carter*, 378 F.3d 584, 589 (6th Cir. 2004). *But see United States v. Cowart*, 2009 WL 1588647, at \*8 (W.D. Tenn. 2009) (finding the officer's lack of intent to deceive to be significant).

While the misrepresentations of a police officer must be considered in determining whether consent was coerced, an officer may "usually" gain access to a suspect's home under false pretenses without violating the Fourth Amendment. *Hardin*, 539 F.3d at 424-25. The boundary between a permissible ruse and impermissible coercion is whether the suspect believed he had "no choice" but to invite the officer in. *Hardin*, 539 F.3d at 425; *Carter*, 378 F.3d at 588; *United States v. Jones*, 2009 WL 77449, at \*5 (E.D. Tenn. 2009). Thus, police officers may not search a suspect's home while disguised as repairmen investigating a gas or water leak, *Hardin*, 539 F.3d at 425, but they

4

may pose as persons interested in purchasing drugs, *United States v. Baldwin*, 621 F.2d 251, 252-53 (6th Cir. 1980).

Because officers' misrepresentations may sometimes be coercive, and because a suspect's subjective vulnerabilities are considered in the analysis, police leave much to chance when they attempt to gain consent by subterfuge. Here, however, in the totality of the circumstances, I **FIND** Shelton's representations did not rise even close to the level of coercion. First, there has been no showing that a "ruse" was used to gain access to the garage. Second, even assuming, for purposes of argument only, that Shelton feigned interested in Defendant's classic Camaro to gain entry, the officers here did not create a false emergency leaving Defendant "no choice" but to consent (unlike the "repairman" ruse disapproved in earlier cases). Third, there is no evidence that Defendant was particularly vulnerable to coercion, except perhaps in his enthusiasm for sharing his love of classic Camaros. There is simply no support in the case law for the proposition that a suspect's enthusiasm in giving his consent can serve as a basis for invalidating it. Fourth, and finally, Defendant's conversation with the agents left Defendant ample room to refuse their entry. Indeed, Defendant could have avoided his current predicament simply by refraining from *inviting* the agents into his garage. The officers did not misrepresent their identities; Defendant *knew* he was allowing police officers into his garage, and he chose to invite them in despite that knowledge.

While Defendant's invitation was not prudent under the circumstances, the Fourth Amendment does not exist to protect criminal suspects from their imprudence; it protects them only from unreasonable police conduct. *See United States v. Lazar*, 2010 WL 1753373, at *4 (6th Cir. May 4, 2010) (explaining that the applicability of the exclusionary rule turns on the culpability of police conduct and the deterrent effect of exclusion). Here, agents Shelton and Sills acted

reasonably, and I therefore **CONCLUDE** Defendant's consent was valid.

Accordingly, I **RECOMMEND**[3] that Defendant's motion to suppress [Doc. 10] be **DENIED**.

                                          s/*Susan K. Lee*
                                          SUSAN K. LEE
                                          UNITED STATES MAGISTRATE JUDGE

---

[3] Any objections to this report and recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party. Such objections must conform to the requirements of Rule 72(b) of the Federal Rules of Civil Procedure. Failure to file objections within the time specified waives the right to appeal the district court's order. *Thomas v. Arn*, 474 U.S. 140, 149 n.7 (1985). The district court need not provide *de novo* review where objections to this report and recommendation are frivolous, conclusive and general. *Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986). Only specific objections are reserved for appellate review. *Smith v. Detroit Fed'n of Teachers*, 829 F.2d 1370, 1373 (6th Cir. 1987).